Tucker, P.
On the merits of this case, I am clearly of opinion to affirm the decree. The conveyance of the whole of the estate of a wretched sot, about whose capacity to contract, even for valuable consideration, the whole country is divided, to a cousin, to the prejudice of four half sisters, reserving to himself but a life estate, and giving away the residue for nothing, cannot, I think, be sustained with any sort of propriety. Drunkenness, it is true, is no excuse for crime; but if produced by the donee, or if so extreme, that the party does not know what he is about, it has been considered as a material circumstance in deciding upon a contract: and imbecility of mind, however produced, combined with other ingredients, and particularly with the utter absence of consideration, has always had an important influence upon the question of the validity of contracts. That Coleman was reduced to a state of imbecility, which rendered him liable to be plundered by the designing, I think is abundantly proved. That he was the object of the designs of several around him, we learn are from his own declarations, and it appears he himself was afraid, that, in some *573 moment of more than common imbecility, he would fall a prey to their cupidity. That he has done so at last, appears to me very certain. It only remains for the tribunals of justice to redress the wrong.
The motives which have been assigned for this extraordinary act, are inadequate to account for it. The boyish promise to make his cousin the inheritor of his estate, if he should die without heir, though we should extend it farther than the express words, by the gloss of supposing that he meant his dying without children, will not account for such an act, at a time of life when romantic notions, are tempered, in the man of sense, by reflecting on what is due to nature and to feeling. Still less will it account for the execution of a deed in his lifetime, instead of a will to take effect after his death ; an absolute instead of a revocable instrument ; an instrument, which destroys at once, the only motive that stimulates most of those around a miserable drunkard, to pity his weakness, to bear with his offensiveness, to protect him when he cannot take care of himself, and to minister to him in his revolting infirmities; instead of an instrument, which, by being revocable in its character, would hold out a perpetual lure to all the seekers after his fortune, and secure to him, to his latest breath, their mercenary services, if he could not command their affectionate attentions. Had he made a will, instead of a deed, we should probably not have found him, as represented by one of the witnesses—dying, without the benefit of medical aid, which, if it could not have saved his exhausted constitution, might, at least, have soothed and mitigated the sufferings of his dying moments.
The next motive assigned for the execution of this deed, is a desire to free himself from the constant solicitations of those around him, to give his property to them. He did not, then, wish to part with his property. Why has he done it ? If this was the motive, the act must be interpreted as commensurate with the motive. Construe the deed to have been made upon a secret trust, that the property was to be *574 held for his benefit and at his disposal, and that the exeeution of it was intended merely to hoodwink the greedy ex-pectants around him ; then, indeed, the motive will account for it; but then, in execution of the trust, the property must be reconveyed. This view of the transaction, indeed, not only presents it in a less offensive form in its inception, but is rendered not improbable, by the fact, that Samuel conveyed away the property as Coleman directed, subsequently to the deed; and that Coleman himself disposed of it at pleasure, but referred those to whom he sold, to Samuel for a title, which was made accordingly. Yet these facts are not much in unison with the declaration, repeatedly made by him, that he did not recollect that he had ever made such a deed. So that the mind cannot be free from doubt which hypothesis to adopt. Either will lead to the same result.
Another fact upon which reliance is placed, to account for this extraordinary deed, is the alleged variance between Coleman and his half sisters. It is most singular, that as to one of them, this alienation of affection is said to have existed when she was only about seven years old; and it cannot be denied, that there is a conflict of testimony as to his feelings towards them all. But take it for granted—in this state of things, no importunity was to be feared from them. Coleman could sufficiently vent bis spleen against them by a will. Are we to suppose, that the inveteracy of his feelings was such as to induce him to shut the door upon all hope of reconciliation ? If he executed a will to their prejudice, it might be revoked, in case he should be reconciled to them. But by executing a deed to another, he tied his hands forever : he put it out of his power to yield to the impulse of natural feelings in their favour, whenever the unnatural hostility between them should have an end. Is it, then, most charitable to suppose, that Coleman, if he was of sound mind, executed this deed to cut himself off from future repentance in their favour, or that he, who from his boyhood had been looking forward to the reversionary interest in this estate, had contrived this scheme by which he *575 might “ make assurance doubly sure.” I think I outrage , , . . human nature least, by the latter supposition.
It was said, that there is no proof of any fraud, imposition or contrivance on the part of Samuel. It is true, that except what has leaked out about the compensation to the draftsman for drawing the deed, we see little of Samuel’s agency. But fraud is neither less certain, nor less successful, for being concealed. When it is so, it may indeed elude us, unless detected in the results. Such is the case here. The estate of an imbecile is conveyed to Samuel, without consideration, by an irrevocable instrument, executed among strangers, out of his own neighbourhood, and to the prejudice of four half sisters, the natural heirs of his bounty; and this upon flimsy pretences, which can in no wise justify or account for the transaction. These facts are sufficient to stamp the transaction as one which this court should discountenance; and from them, and not from the conflicting opinions of witnesses as to the extent of Coleman’s capacity, I conclude, that the deed was properly set aside by the chancellor.
Had there been a quid pro quo, we might have hesitated. But, surely, the question is very different, between a contract for valuable consideration, and this gift by an habitual sot, of his whole estate, to take effect at his death, to the disherison of his sisters and natural heirs. In other states, a commission of lunacy might have been issued against him, which would have placed his property intirely out of his control: and, even in the english courts we are told, a commission of lunacy extends to the case of imbecility produced by habitual intoxication, and this in a case “ where the party, when he could be kept sober, was a very sensible man, but in a constant state of intoxication he was perfectly incapable, and would have been constantly contracting insanity;” per lord Eldon in Ridgeway v. Darwin, 8 Ves. 66, 7. If we have not gone so far in Virginia, it behoves us, at least, to protect such unfortunate persons from overreaching bargains and improvident gifts of their estates, when every na *576 tural feeling is quenched by intoxication. The cases of Whitehorn v. Hines, 1 Munf. 557. Bridgman v. Green, 2 Ves. sen. 627. Huguenin v. Baseley, 14 Ves. 273. are not stronger than this.
The decree, however, is erroneous, in directing Samuel to surrender the personal estate of the decedent Coleman, to the plaintiffs, they not being his proper representatives, though they are interested to set aside the deed; and also, in decreeing payment of the uncollected proceeds of the. five slaves, that were received in part payment for the 200 acres of land, and afterwards sold by Samuel. The decree is to be corrected in these particulars.
The decree entered by this court, declared, that there was no error in the decree of the court of chancery, so far as it went to vacate and annul the deed which the bill sought to set aside; but that it was erroneous, in directing the surrender of the personal property and the payment of the personal assets, to the plaintiffs, they not being the legal representatives of the deceased Coleman; and also, in decreeing the payment to the plaintiffs of the proceeds of the sale of the five slaves received in part of the price of the land sold, instead of decreeing, that so much as had been collected, and the bonds and evidences of debt for the residue thereof, should be paid and delivered over into the hands of a receiver, to be collected and held by him, until, as between the appellees and the personal representative of the decedent, the right to the- same should be ascertained. Therefore, the decree as to these particulars was reversed with costs, and as to the residue thereof affirmed; and the cause remanded, to be further proceeded in according to the principles here declared. But this decree to be without prejudice to any suit, which any legal representative of ■Coleman may hereafter bring against Samuel for the recovery of the assets of Coleman in his hands.